[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a class action at law brought by the named plaintiffs on their own behalf and on behalf of the entire class of persons similarly situated, consisting of all those taxpayers of the town of Old Saybrook, Connecticut as set forth in the grand list of October 1, 1989. This class action was brought in accordance with Sec. 52-105 of the Conn. General Statutes and meets the criteria of Sec. 87 of the Practice Book. On motion duly made and stipulation filed in connection therewith, the court granted the plaintiff's motion for certification as a class action and duly ordered notice of certification of the class published in the Pictorial Gazette on August 27, 1991 and September 3, 1991 and September 10, 1991. That order was duly complied with and a limited number of potential members of the class, within the period allowed by law, filed declination of interest with the clerk of the Superior Court and are excluded from the class as previously designated and set by the court.
In their complaint the plaintiffs' claim that they have received tax bills based upon assessments illegally established as have other members of the class. It is asserted that the named defendant, Lucille B. Kelly, is the duly appointed assessor of the town of Old Saybrook and that the defendant, Olive Mulvihill is the duly elected tax collector of the town of Old Saybrook. It is further claimed that in her capacity as Town Assessor the adoption of the grand list of real estate property prepared by the assessor for the year 1989 was illegal, invalid and contrary to the CT Page 10170 requirements of law because she failed to view all of the real estate listed upon the grand list and further that in revaluing and assessing the real estate of said grand list she failed to exercise her own independent judgment in the revaluation of the properties therein but relied upon and adopted those values submitted by SLF Appraisal Incorporated the consultant appraisal company.
As a result thereof the plaintiffs as representatives of the class claimed damages, attorney fees and temporary and permanent injunctive relief restraining and enjoining the tax collector, the defendant Olive Mulvihill, from collecting any further real estate taxes based on the assessment of October 1, 1989, and further a declaratory judgment determining that the defendant, Lucille B. Kelly, acted illegally and not in compliance with Connecticut General Statutes See. 12-62.
The court conducted a substantial hearing in connection with the claims of the parties herein and the following represent this court's findings of fact and conclusions of law. The defendant Lucille B. Kelly (hereinafter referred to as Kelly) has been the assessor for the town of Old Saybrook since March 1989 and up to the present time. The assessor of said town is appointed by the Board of Finance. Kelly has resided in Old Saybrook since 1960 and she was first employed in the assessor's office in 1984 as an office clerk performing various clerical functions in the nature of filing and abstracting information from the land records.
In May 1987, the town entered into a contract with SLF, a mass appraisal company based in Rhode Island, to revalue the properties for assessment in the town of Old Saybrook for the list of October 1989 in accordance with the mandates for decennial revaluation pursuant to Connecticut General Statutes See. 12-62. Said process began in the fall of 1987 at which time Kelly was the assistant to the assessor. The prior revaluation had been done on the grand list of October 1, 1979.
Barbara Appleton, (hereinafter referred to as Appleton), was the SLF project manager for the revaluation of the residential properties in Old Saybrook. Appleton established that their process involved three phases: (1) the data gathering phase; (2) the analytical phase and (3) the review phase.
The data gathering phase involved work of measurers and listers who are SLF employees. These people CT Page 10171 are the ones who actually visit the premises and measure the buildings on the property being assessed. They also gained entry for purposes of reviewing and evaluating the interior of each building and recording the characteristics of the buildings such as the number of rooms and bathrooms. This data was all recorded on a data sheet. In addition to this, these measurers and listers also made entries on the work sheets that will be discussed hereinafter in more length in the nature of judgments as to depreciation, quality, condition, depreciation factors having to do with functional, use and economic considerations. These employees of SLF did substantially more than merely gather factual data.
In the Old Saybrook revaluation they gained entry into approximately 90% of the residential homes.
The analytical phase involved the study of sales information to determine a base lot value for each neighborhood. They determined that a base lot is a lot of the minimum size permitted by zoning for the particular zone in which the neighborhood was located. They along with the local officials set up a committee of different people from the town and established either 10 or 12 "neighborhoods" for the purpose of establishing some sort of general classification of areas for the application of revaluation data. Kelly worked some with Appleton in connection with deriving basic lot values. Sales data on various properties in the neighborhoods were provided to SLF who utilized these and analyzed them and processed them into their computer. They used a computer program that was based on a Marshall and Swift book which they claimed is one of analysis of the cost of building construction. Kelly had no knowledge or understanding of the Marshall and Swift computer program. Appleton and Kelly traveled together several times each week during the analytical phase to examine some of the properties.
The review phase was performed by a reviewer who an SLF employee and who was certified by the State of Connecticut, apparently, under State regulations, to review properties. The reviewer examined the data collected by the measurers and listers, the spread sheets of such data and the sales sheets. The reviewer also examined the properties and made the first property evaluation, which was then entered on the spread sheet. The reviewer determined the amount of depreciation to apply and made various other specific judgments as to factors directly effecting the final evaluation of a property. These factors applied separately to the buildings and to the land itself.
During this phase Appleton and Kelly monitored CT Page 10172 some sales taking place until their date of final assessment was arrived at and they had some discussions about various work sheets and property values logged on some of the work sheets.
The final document produced by this system was a computer card that contained the final values taken from the spread sheets. The computer card became the assessor's property card. Appleton turned the cards over to Kelly for her final review and approval.
Kelly admitted, and the court finds from the evidence, that she did not review all the work sheets or spread sheets and that she did not review all of the field cards. Kelly did not view and review all of the properties being revalued in her municipality. Kelly viewed some properties but is unable to testify as to how many. She claimed to have "viewed 90%" of said property by driving up and down the streets of Old Saybrook and looking at them from her car as she passed by.
Kelly claims that she did approve the valuation of all of the properties submitted to her by SLF.
The aforementioned findings relate generally to the residential properties and we now proceed to discuss the process employed in revaluing for assessment the commercial properties located in the town of Old Saybrook. The assessor does not know how many residential properties are located within her municipality nor how many commercial properties are located within her municipality nor how many vacant land units are located within her municipality. Appleton claims that there are 4,700 residential units, 400 commercial units and an undisclosed number of vacant land units.
Ralph Wilcox an SLF employee testified that he was the assistant supervisor of the revaluation project and that he was solely responsible for the revaluation of the commercial properties in Old Saybrook. He established that a team of their employees, listers and measurers, gathered data on the properties and that 100% of the commercial properties were viewed by the data collectors. The data teams made inspection reports and gave them to Wilcox for his review. Wilcox testified that Kelly went with him and some of the data collectors to look at a sampling of commercial types of properties. The court finds that in accordance with Wilcox's testimony that he was solely responsible for determining their review and value of the commercial properties. He submitted his results to Kelly for her approval and then upon her acceptance valuation notices were CT Page 10173 mailed to property owners. With respect to the subsequent findings that are made in conjunction with the performance of various functions and duties in connection with this whole revaluation process, it is of great note that, in connection with the commercial properties that Kelly had minimal input into the setting of land values and substantially no input into the setting of commercial building values. This court concludes that this process is particularly fragile from a legal stand point for these reasons and due to the fact that the court finds from Wilcox's testimony the appropriate methodology for evaluating commercial properties is the income approach and the capitalization thereof as against the cost or market data approach. Since the underlying SLF contract with the town of Old Saybrook required that all properties be valued on the basis of the cost approach, the income approach in fact was used in the revaluing the business properties. The results of the income approach so used were "juggled" in order to have them conform to a cost analysis. In any event Kelly gave her stamp of approval to all of the results of Mr. Wilcox's work in connection with the business property evaluation. She had very little to do with it and did not review all of the spread sheets or view substantially all the properties.
With respect to a so called division of responsibilities, and who did what, the court further finds that Kelly gave to SLF the appropriate field cards covering all of the properties in town. Kelly collected no individual data herself with respect to any of the properties but this was all done by the employees of SLF. Kelly worked with the committee and SLF and broke the town down into 10 or 12 "neighborhoods" and was involved in the selection of sales and participated in the adoption of basic lot values for each of the neighborhoods. What the basic lot value or site value was in each neighborhood was established, and this evaluation was assigned to whatever portion of the premises met the minimum zoning requirements for that area. Kelly understood very little, if anything, about the computer program for building valuation, utilizing the Marshall and Swift digest. Virtually all of the judgments with respect to the application of field adjustment factors to the evaluations of both land site and the buildings located on them were judgments made by SLF personnel. These judgments were subsequently approved by Kelly without her having viewed the property and without her having reviewed all of the individuals' spread sheets. The reviewers and/or listers and measurers assigned "grades" to property which affected judgments as to depreciation percentages relating to economic, physical or functional depreciation, and also physical depreciation with respect to the condition of the CT Page 10174 inside and outside of the buildings. Because she did not have personal knowledge of or view substantially any of these premises, Kelly was not in a position to exercise her own judgment with respect to the validity or invalidity of the judgment passed on these various features by SLF which were integrated into the revaluation assessments of all the individual properties in the town.
With respect to basic lot values, these valuations were somewhat altered by SLF during the evaluation process and Kelly was not cognizant of the extent, in terms of amount or numbers, of properties affected by alterations made by SLF personnel to basic lot values in view of ongoing sales. Consequently this court is unable to make any finding that Kelly had sound basis for her ultimate alleged approval of land valuations within the town. The assessor did not assess individually and separately the parcels of land with improvements thereon within said town.
Kelly did not know who worked out the chart of age and obsolescence that was utilized in connection with the valuation of the individual properties. She did not know who prepared the final draft of the chart. It is conceded that it was used and that its application involved judgment calls which were made by SLF personnel, the ingredients of which were not known to Kelly in most of the property valuations.
With respect to lot valuations, the problem that this revaluation process poses with respect to virtually all the properties in the town of Old Saybrook is that since the assessor did not view the premises physically nor did she view and/or review all of the spread sheets, her judgment was never adequately nor independently exercised in connection with whether or not the adjustment guide lines were properly applied to the individual properties or, if, for example, no adjustment guidelines were applied, should they have been.
The court finds that in a few instances Kelly did change property values because she was familiar with some limited number of properties. This individual judgment and decision making process was not exercised by Kelly with respect to the greatest percentage and substantially all of the remaining properties in the town. This court, of course, agrees with the concession by Kelly that it is preferable for the assessor to see the lot personally if the land adjustments are to be correctly applied.
SLF came up with the final values which were CT Page 10175 unquestionably given a stamp of approval by Kelly. Kelly was unable to estimate for the court the percentage of spread sheets she reviewed.
The methodology by which individual property values are arrived at under the contract, and, indeed, in practice was that to establish the unit land value, they took the cost of the building, deducted that from the sales price and arrived at the land value. Several of these land values were then considered by SLF in arriving at and recommending to Kelly a final basic land value for that neighborhood. Of course part and parcel of this process as hereinbefore noted was that Kelly had little or nothing to do with the evaluation process and judgments made in connection with the building evaluations. This had a direct effect on the resulting land value.
This court finds that Kelly did not understand what the computer program was that utilized Marshall Swift in connection with setting of a building values and that the SLF personnel, including the reviewers, made the final judgment decisions having to do with the building values and, also, the economic and topographical features that affected the basic land evaluations.
In addition the evidence produced another problem that Kelly apparently was never aware of, and that was that SLF evaluation process valued all of the properties in the town of Old Saybrook at 90% fair market value. It was upon this valuation that ultimately the 70% assessments were levied. The court finds that Kelly was unaware of this feature of the revaluation process.
In connection with the commercial properties, the SLF employee, Wilcox, analyzed the income and expense statements, he analyzed the retail store rentals and multiplied them by the square footage to arrive at an economic or an average retail rental value. The evidence discloses that neither the project manager nor Kelly knew very much of the intimate details of the process being utilized by Mr. Wilcox in connection with the setting of the business and/or commercial revaluation assessments. Wilcox himself exclusively did 70% of said revaluations. Hazel and the project manager were involved somewhat in about 30% of them, the project manager being basically concerned with the property values only. The capitalization rates applied to these economic appraisals of the business properties were set by Mr. Hazzard, another employee of SLF.
From Mr. Wilcox's testimony this court CT Page 10176 concludes that Kelly had no oversight or control over Mr. Wilcox. Kelly reviewed with him a sampling of property types. Capitalization rates were set by Mr. Hazzard and there is no evidence to indicate that Kelly knew of its basis or rationalization, or appreciated its significance in connection with the appraisal process.
Kelly approved what SLF had done in connection with the revaluation of the business properties and the evidence indicates and the court finds that she did not look at their spread sheets to review the appropriateness of the data upon which such evaluation was based. Further, because of the questions raised in connection with the residential evaluation percentage, this court is not aware, and the evidence does not establish, whether or not business properties were valued for assessment purposes at 100% of market value or at the 90% level of fair market value as were the residential properties before arriving at the 70% current evaluation for taxation purposes.
In connection with the court's finding that Kelly did not review the commercial data sheets, it is found that the assessor Kelly made no value changes in the commercial properties as submitted by SLF. It was also established that Kelly had failed to "sign off" on the commercial spread sheets as apparently had been done in connection with other parts of the evaluation process.
In view of the foregoing findings, the court must now consider the two core issues presented by the plaintiff and claimed to be fatal to the revaluation process as it affected all the properties in the town.
Conn. General Statutes Sec. 12-62(a) effective at the time the subject revaluation stated in pertinent part:
 Commencing October 1, 1978, the assessors of all towns shall. . . no later than ten years following the last preceding revaluation of all real property and every ten years after such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately CT Page 10177 approved by a majority of the assessors.
The first claim to be adjudicated by this court is the failure of the assessor to view all of the real property listed upon the grand list. That she failed to do this is conceded in the pleadings and the court finds from the evidence that indeed the assessor did not view all of the properties in Old Saybrook as part of the revaluation process. As a matter of fact, the court finds that she actually viewed only a minimal percentage of the properties in the town, since this court does not find that an "automobile drive-by," as testified to by the assessor, of 90% of the properties constituted a view as required by the statute. The American Heritage Dictionary 2nd College Edition defines "view" to be an examination or inspection; a systematic survey; a specific perception, observation or interpretation. Further is defined to mean to see, to behold, to examine or inspect. This court concludes that the meaning or view in this respect was not complied with by the assessor herein.
The Supreme Court held, in connection with this statutory requirement of viewing the property, in the case of Conzelman v. The City of Bristol, 122 Conn. 218 (1936) that a breach of duty by the assessors may be of such a nature as necessary to effect the entire grand list, such as a failure to obey a mandatory statutory requirement. . . . On the other hand, an error which affects only the evaluation of property of a particular taxpayer can be adequately remedied by an appeal by him to the board of the tax review. A closer reading of the Conzelman case indicates to this court that, at the very least it does say by implication, contrary to the claims of the defendants herein, that the assessor ought view each of the properties within the ten year period. What Conzelman does hold is that it is not necessary that this be done within one year of that ten year period, specifically the year in which the grand list revaluation is being accomplished. This appreciation of the holding Conzelman would appear to be substantiated at page 223 wherein the court said that, "the assessors did not, for the purpose of preparing the grand list now before us, view all of the real estate in the city or that they attempted, as the plaintiff's claim, rather a formal than an reasonably adequate survey of the properties they viewed, cannot of itself render invalid the present assessment. That they and the other officials in the city were mistaken as to the intent embodied in the law cannot change its proper meaning; and however far the assessors may have fallen short, at this time, of full compliance with the statute, they still have CT Page 10178 left some years of the decade in which they can fully and adequately view and revalue all of the real estate in the city." Where as in Conzelman in 1936 the assessor of the City of Bristol had time left in which he could comply with the mandate of the statute that he view all the properties, such is not the case in Old Saybrook, since as of 1989, the assessment date for the revaluation herein, the mandatory decennial period for revaluation had expired.
Further, in any substituted way, it cannot be concluded that the assessor viewed the properties because Kelly did not even separately view and evaluate all of the individual field cards or spread sheets, notwithstanding her testimony, that the court cannot ascribe great credibility to, that she remembered a substantial number of the properties as she viewed the cards. Since she did not comply with this mandate of the statute, it must be decided herein whether this, in and of itself, and/or, in conjunction with other matters presented to this court, constituted such a deviation from the statutory mandates of the law that would render the entire assessment invalid.
The failure to view all the properties and to have first hand analysis available to her rendered the assessor incapable of passing her own independent judgment in connection with the various factors hereinbefore mentioned that have crucially affected virtually all of the assessments of the various properties in the town, to wit: including but not limited to obsolescence grade condition, topographical features, and utility features. This court finds that Kelly, in fact, permitted SLF to substantially exercise the assessment judgments that ought to have been exercised by her as the statutory assessor for the town of Old Saybrook.
Further review of Conzelman, supra, indicates that in that case the court noted the following processes had been followed by the assessor's in the town of Bristol in 1936, to wit:
 "During 1935, the agents of the service company made a general survey of the real estate in the city and accumulated a large amount of data concerning it. The assessors kept thoroughly in touch with the work done by the company and learned its methods. The company, working through a committee of real estate men in the city, made up a schedule CT Page 10179 of unit values with fixed front foot values in the thickly settled districts and acreage values in the rural districts. The assessors considered these unit values, approved some and altered others, and finally adopted as their own the figures so approved or altered. The company also, after exhaustive investigation of reproduction costs in the city arrived at unit valuation of various types of construction, which were submitted to the assessors and, upon the basis of those figures the assessors, relying largely upon judgment of one of their number, an experienced building contractor, adopted a table of such unit valuations. The unit values were applied to each taxpayer's land and buildings under rules approved by the assessors and the value of each property so determined was entered upon a card under the name of the taxpayer. . . . They sat around a table and each taxpayer's card was taken by one of the assessors and checked by him. They had all been in office for a period of years and were familiar with most of the property in the city. If in checking over any card a valuation thereon appeared to be out of line with the unit values so agreed upon or with the general knowledge of the particular assessor had of the specific property, the assessor handling the card would discuss the valuation with the other two assessors. This occurred in the case of a large proportion of the taxpayer's card and changes were made in the valuation of the property of some 700 taxpayers out of a total of about 6,000. . . . In assessing the various pieces of property they used the system CT Page 10180 formulated by the company and adopted by them and checked the results thereby obtained with their own knowledge the various the properties. . . . In using the data and information collected and tabulated by the company and following the rules suggested by the company, the assessors did so only in so far as their own judgment dictated that they should. The assessments finally made and the abstract thereof signed and sworn to by the assessors with acts of the assessors in the exercise of their own judgment rather than that of the company.
In this case, this court cannot and does not find that Kelly acting as the assessor complied with or followed the norms established as aforementioned in the Conzelman case. Accordingly, it is concluded that the most substantial and greatest percentage of the revaluation assessments made in the town of Old Saybrook were not the acts of the assessor in the exercise of her own judgment, but were rather the acts and conclusions of the company, SLF, hired by the town to be of assistance in arriving at the revaluations in the town of Old Saybrook.
Conzelman further stated at page 226, "it is not always easy to draw a line between those failures in the performance of their full duty by assessors which will invalidate an entire assessment and those which are available only to the individual taxpayer whose property is incorrectly valued. There probably never was a grand list where with reference to certain properties included, the assessors did not fail in the strict performance of their duty. To invalidate the entire grand list of a municipality is an act fraught with very serious consequences. A breach of duty by the assessor may be of such a nature as necessarily to affect the entire grand list, such as a failure to obey a mandatory statutory requirement. Thames Mfg. Co. v. Lathrop, 7 Conn. 550; Hartford v. Poindexter, 84 Conn. 121,130. This court concludes because of the nature and extent of the errors and the method of valuation employed in the revaluation process in the town of Old Saybrook of the individual properties is of such an extent that the levy of tax upon the grand list would be likely to produce substantial injustice to the taxpayers of the community as a whole. CT Page 10181
A municipality has no powers of taxation other than those specifically given by statute. Empire Estates, Inc. v. City of Stamford, 147 Conn. 262, (1960); E. Ingraham Co. v. Town City of Bristol, 144 Conn. 374, (157). As a result, strict compliance with statutory provisions is a condition precedent to the imposition of a valid tax. If a statutory provision is mandatory, it must be followed or the assessment will be invalid. Rocky Hill Inc. District v. Hartford Rayon Corp., 122 Conn. 392 (1937).
No word in the statute is treated as superfluous or insignificant. State v. Roque, 190 Conn. 143, 150
(1983); O'Brien Properties, Inc. v. Rodriquez, 215 Conn. 367,372 (1990). The inclusion in Sec. 12-62 (a) of the words, "all," and "separately," are of significance. They clearly require that the assessor revalue and then separately approve all of the valuations on the grand list. This the Old Saybrook assessor, the defendant herein, failed to do. That her utilization of assistance from the SLF company was permitted by law is beyond question. This court finds however that in abdicating her independent judgment with respect to the revaluation process and failing to view and separately revalue the properties in said town she has failed to comply with the mandates of law thus rendering invalid the revaluation assessment of the town of Old Saybrook.
The special defenses of Laches and Bar of the Statute of Limitations find no support in the evidence, the claims of the defendant as briefed, or the law and are found to be without merit.
Judgment is hereby entered in favor of the plaintiffs. They are entitled to declaratory and injunctive relief. The revaluation assessments of October 1, 1989 are declared null and void. The plaintiffs' attorney is instructed to file with this court forthwith a proposed declaratory and injunctive order and the defendant may file a responsive order within 5 days thereafter. This court retains jurisdiction to enter such final orders herein as it may deem necessary including orders addressing the other claims for relief.
It is so ordered.
HIGGINS, J.
Judgment Entered in Accordance with Foregoing Memorandum of Decision. CT Page 10182
Michael Kokoszka, Chief Clerk